❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 24-929M(NJ) |
| Devices a-f, currently stored at the Waukesha | ) | |
| County Drug Task Force Offices, as further | ) | |
| described in Attachment A | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 11/8/2024_____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Nancy Joseph_____.
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*  ❏ until, the facts justifying, the later specific date of _____.

Date and time issued: 10/25/2024 @ 1:26 p.m._____

_____
*Judge's signature*

City and state:  Milwaukee, Wisconsin_____

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

**Property to Be Searched**

The property to be searched are the six cellular phones recovered from inside and immediately outside a White 2008 Toyota Tundra, VIN 5TBRT54108S461313, bearing Wisconsin license plate ATK-2330, located near 1612 North 26th Street, Milwaukee, Wisconsin, on September 25, 2024, more fully described as the following, hereinafter referred as the "Devices":

    **a.** a gray TLC flip phone track phone, unknown serial number, located on driver's side floorboard;

    **b.** a gray Vortex smartphone with a clear rubber case, unknown serial number, located on the ground outside the driver's door;

    **c.** a black Maxwest smartphone, unknown serial number, located in a tan bag in the rear passenger's seat;

    **d.** a gray Consumer Cellular smartphone, unknown serial number, located in a tan bag located on the rear passenger's seat;

    **e.** a white iPhone, unknown model or serial number, with a shattered back, in a black case, located on the front passenger's seat; and

    **f.** a white iPhone, unknown model or serial number, with a cracked front screen, inside of a black case, located on the front passenger's floorboard.

The Devices are currently stored at the Waukesha County Drug Task Force Offices (WCDTFO), located in Waukesha, Wisconsin.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

**ATTACHMENT B**

**Particular Things to be Seized**

All records and information on the Devices described in Attachment A that relate to violations of illegal possession with intent to deliver controlled substances, and conspiracy to do the same, in violation of Title 21, United States Code, Sections 841 and 846; and use of a communication device in furtherance of drug trafficking, in violation of Title 21, United States Code, Section 843 including:

    a.  Preparatory steps taken in furtherance of this crime;

    b.  Any audio, video, and/or photograph(s) files on the phone of criminal activity or of evidentiary value;

    c.  All voicemail and call records;

    d.  All text messages and call history;

    e.  Contact list, to include names, addresses, phone numbers, and/or email addresses;

    f.  All social media sites used and applications for social media sites;

    g.  Lists of customers and related identifying information;

    h.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    i.  Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information); and,

    j.  All bank records, checks, credit card bills, account information, and other financial records.

    k.  All internet activity;

    l.  All location data including from the phone and/or from any downloaded applications;

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

   a.   records of Internet Protocol addresses used;

   b.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the case agents may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 24__929M(NJ ) |
| Devices a-f, currently stored at the Waukesha County Drug Task Force Offices, as further described in Attachment A | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 843 &846 | Distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances; use of a communication device in furtherance of drug trafficking. |

The application is based on these facts:

See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Aaron Hoppe, DEA TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 10/25/2024

_____
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF**</u>
<u>**AN APPLICATION FOR A SEARCH WARRANT**</u>

I, Aaron Hoppe, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being first duly sworn, hereby depose and state as follows:

## I.      INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — electronic devices which are currently in law enforcement possession — and the extraction from that property of electronically stored information described in Attachment B, based at least in part on personal observations, knowledge and reports written by other law enforcement investigators, which I consider to be truthful and reliable.

2.      I have been a law enforcement officer since May 30, 2007.  I am currently assigned to the Waukesha County Sheriff's Department Detective Bureau.  I have been assigned to a Federal Drug Task Force (Milwaukee HIDTA) and have been assigned to the Waukesha County Metro Drug Unit in 2012-2013, 2015-2017, and from 2022-Present.  I have been a part of hundreds of state and federal investigations related to drug activity.

3.      I have received extensive training on the investigation of death investigation, narcotics investigation, cell phone analytics, and I am currently a member of the Board of Directors for the Wisconsin Association of Homicide Investigation.

4.      I have conducted investigation ranging from death, drug, property, and child exploitative crimes by analyzing cell phone data including tower usage, call activity, and cellular activity while trying to pinpoint certain locations of suspects and/or victims.  I know that when

conducting an investigation into many drug investigations, and drug related death investigations that the cellular phone data will be a key piece of evidence based on my training and experience. Individuals who sell and use narcotics will mainly utilize their cell phone to set up a transaction for narcotics utilizing their cellular phone or a special application downloaded on their phone. I know it is common practice for most people to rely heavily on the use of cellular telephones or electronic devices for many aspects of their daily lives. People commonly use cellular telephones or electronic devices to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos, which are also used by drug traffickers and are valuable evidence in drug trafficking investigations.

5.      I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps.

6.      My training and experience include the following:

a.      Through informant interviews and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations finance, source, purchase, transport, and distribute controlled substances in Wisconsin, throughout the United States, and internationally.

b.      I have used my training and experience to locate, identify, and seize multiple types of narcotics, drugs, drug proceeds, and drug contraband.

c.      I have also relied upon informants to obtain controlled substances from drug traffickers and have made undercover purchases of controlled substances.

Page 2

d.     I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

e.     I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug traffickers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances.

f.     I am familiar with the language used over the telephone and other electronic communications to discuss drug trafficking and know that the language is often limited, guarded, and coded. I know the various code names used to describe controlled substances. I also know that drug traffickers often use electronic devices (such as computers and cellular phones), electronic communication services (such as e-mail and messaging services), and social media to facilitate these crimes.

g.     I know drug traffickers often register phones, mailboxes, bank accounts, electronic communication services, and other instrumentalities of drug trafficking in the names of others, also known as nominees, to distance themselves from instrumentalities used to facilitate drug trafficking.

h.     I know that drug traffickers often use electronic equipment and wireless and landline telephones to conduct drug trafficking operations.

i.     I know that drug traffickers often keep documents and records about the transportation, sourcing, ordering, sale, and distribution of controlled substances this includes on electronic devices.

j.     I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase or title these assets in order to avoid scrutiny from law enforcement officials. I know that drug traffickers often secure drug proceeds at locations within their dominion and control, such as their

Page 3

residences, businesses, and storage facilities, and in safes or other secure containers.

k.    I know that drug traffickers often attempt to protect and conceal drug proceeds through money laundering, including but not limited to domestic and international banks, securities brokers, service professionals such as attorneys and accountants, casinos, real estate, shell corporations, business fronts, and otherwise legitimate businesses which generate large quantities of currency. I know it is common for drug traffickers to obtain, secrete, transfer, conceal, or spend drug proceeds, such as currency, financial instruments, precious metals, gemstones, jewelry, books, real estate, and vehicles. I know it is common for drug traffickers to maintain documents and records of these drug proceeds, such as bank records, passbooks, money drafts, transaction records, letters of credit, money orders, bank drafts, titles, ownership documents, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other documents relating to the purchase of financial instruments or the transfer of funds, and these can be kept on electronic devices. I know drug traffickers often purchase or title assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are titled or purchases by nominees, the drug traffickers actually own, use, and exercise dominion and control over these assets. The aforementioned books, records, receipts, notes, ledgers, and other documents are often maintained where the traffickers have ready access. These may be stored in hard copy or soft copy on paper, computers, cellular devices, and other electronic media or electronic storage devices.

l.    I know drug traffickers maintain large amounts of currency, including in readily accessible financial accounts, to finance their ongoing drug business. I know that those involved in drug trafficking or money laundering keep records of their transactions. Because drug trafficking generates large sums of cash, drug traffickers often keep detailed records about the distribution of narcotics and the laundering of proceeds. I also know that drug trafficking and money laundering activities require the cooperation, association, and communication between and among a number of people. As a result, people who traffic in narcotics or launder money for such organizations possess documents that identify other members of their organization, such as telephone books, address books, handwritten notations, telephone bills, and documents

Page 4

containing lists of names and addresses of criminal associates. Such records also provide information about the identities of coconspirators who launder money and traffic drugs. I also know that drug traffickers commonly maintain addresses or telephone numbers which reflect names, addresses, or telephone numbers of their drug trafficking and money laundering associates in hard copy and soft copy on papers, books, computers, cellular devices, and other electronic media or electronic storage devices.

m.     I know drug traffickers often use electronic devices, such as telephones, cellular devices, computers, and currency counting machines to generate, transfer, count, record, or store the information described above and conduct drug trafficking and money laundering. I am familiar with computers, cellular devices, pagers, and other electronic media or electronic storage devices and their uses by drug traffickers to communicate with suppliers, customers, co-conspirators, and fellow traffickers. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their drugs, and their drug proceeds. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and (2) the objects may have been used to collect and store information about crimes. I know the following information can be retrieved to show evidence of use of a computer or smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; computer media and any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

n.     I have participated in numerous drug trafficking investigations involving the seizure of computers, cellular phones, cameras,

Page 5

and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. This has led to evidence of the crimes under investigation and corroborated information already known or suspected by law enforcement. I have regularly used electronic evidence to find proof relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of suspects and conspirators.

o.   I have also participated in the execution of numerous premises search warrants and arrests, where controlled substances, firearms, drug paraphernalia, drug proceeds, electronic devices, and records relating drug trafficking and drug proceeds were seized. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

7.     I have received training in the investigation of unlawful possession of firearms and possession of firearms by prohibited persons, as well as drug trafficking and related offenses. I have been trained regarding these offenses and has arrested individuals for federal firearms related offenses, as well as drug trafficking offenses. I have also investigated drug trafficking offenses at the state and federal level, including violations of Title 18, United States Code 924(c) and Title 21, United States Code, Sections 841 and 846.  I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media.

8.     I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested.  On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated

Page 6

information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

9. I have participated in the execution of numerous search warrants in which weapons, narcotics, and/or evidence of drug trafficking were seized in violation of state and federal laws. I am familiar with the different types and calibers of firearms and ammunition commonly possessed for illegal purposes, as well as the methods used to conduct narcotics trafficking. I have had a variety of formal, informal, and on the job training in the investigation of illegal firearms possession firearms trafficking, and drug trafficking. Additionally, I am familiar with street name(s) of firearms, controlled substances, and respective related topics, as well as has knowledge of the use of money laundering to conceal ill-gotten money.

10. This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from interviews with cooperating witnesses, and informants, whose reliability is established separately herein.

11. The investigation to date has included traditional law enforcement methods, including, but not limited to: confidential informants, information from other law enforcement officers; recorded conversations; controlled buys; documentary evidence; physical surveillance; telephone records; electronic surveillance; and physical seizures. However, because this affidavit

is submitted for the limited purpose of securing authorization for search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrant.

12. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of distribution and possession with intent to distribute controlled substances, and conspiracy to distribute and possess with the intent to distribute controlled substances, violations of Title 21, United States Code, Sections 841 and 846, have been committed by Marquan OWENS and other identified and unidentified subjects. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## II.    IDENTIFICATION OF DEVICES TO BE EXAMINED

13. The property to be searched are the six cellular phones recovered from inside and immediately outside a White 2008 Toyota Tundra, VIN 5TBRT54108S461313, bearing Wisconsin license plate ATK-2330, located near 1612 North 26th Street, Milwaukee, Wisconsin, on September 25, 2024, more fully described as the following, hereinafter referred as the "**Devices**":

   a. a gray TLC flip phone track phone, unknown serial number, located on driver's side floorboard;

   b. a gray Vortex smartphone with a clear rubber case, unknown serial number, located on the ground outside the driver's door;

   c. a black Maxwest smartphone, unknown serial number, located in a tan bag in the rear passenger's seat;

   d. a gray Consumer Cellular smartphone, unknown serial number, located in a tan bag located on the rear passenger's seat;

   e. a white iPhone, unknown model or serial number, with a shattered back, in a black case, located on the front passenger's seat; and

   f. a white iPhone, unknown model or serial number, with a cracked front screen, inside of a black case, located on the front passenger's floorboard.

14. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

15. The Devices are currently stored at the Waukesha County Drug Task Force Offices (WCDTFO), located in Waukesha, Wisconsin.

### III. PROBABLE CAUSE

16. The United States government, including the HIDTA, DEA, Waukesha County Sheriff's Department and the Waukesha County Metro Drug Unit, is conducting a drug trafficking investigation of Marquan C. OWENS, Makaylah BRACKINS, Raven LAMBERT and other identified and unidentified individuals for violations of illegal possession with intent to deliver controlled substances, and conspiracy to do the same, in violation of Title 21, United States Code, Sections 841 and 846; and use of a communication device in furtherance of drug trafficking, in violation of Title 21, United States Code, Section 843.

17. On December 6, 2023, an undercover agent (UC 1) was involved in a separate investigation and was at a stop light in the City of Milwaukee. A black 2024 Chevrolet Equinox, bearing Wisconsin Fleet plate 20523AFT (Equinox), which was determined to be a rental vehicle, pulled next to UC 1's vehicle. At that point, the two occupants (both black males), began speaking with UC 1 and exchanged numbers with UC 1. UC 1 stated the front seat passenger provided his name, "Rocky," and UC 1 obtained two numbers from "Rocky" and the front seat passenger. Those numbers were 414-885-9481and 414-627-4800.

18. Shortly after the contact, UC 1 received a call from the subjects and was instructed to "pull over for a free sample." UC 1 pulled over, exited the UC vehicle, and approached the Equinox which had pulled directly behind UC 1's vehicle. UC 1 obtained a "sample" of suspected

Page 9

fentanyl from the front seat passenger and returned to the UC vehicle and left the area. The sample

was later weighed and tested. It weighed 1.1 grams and field tested positive for fentanyl. UC 1

was able to obtain video surveillance with still images of the vehicle and the two subjects inside

(Figures 1, 2, and 3).



(Figure 1)



(Figure 2)



(Figure 3)

19.     Based on the prior investigation, case agents are familiar that OWENS goes by the

nickname "Rocky." After reviewing still shot images obtained by UC 1, case agents confirmed

Page 10

that the individual who provided the free sample to UC 1, identified himself as "Rocky," and provided telephone number 414-885-9481, is OWENS.

20.     On January 5, 2024, Marquan OWENS and another individual were arrested by the Milwaukee Police Department (MPD) after fleeing in a vehicle. After the vehicle came to a stop, OWENS and the other subject exited the vehicle and fled on foot.  Officers conducted a search of the vehicle and located suspected controlled substances.  Inside the vehicle's front passenger pocket officers located two clear plastic bags.  The first bag contained a brown/gray substance which field tested positive for methamphetamine, cocaine, heroin and fentanyl. This substance weighed 14.26 grams. The second bag contained a white chunky substance which field tested positive for methamphetamine, cocaine, and fentanyl. This substance weighed approximately 18.0 grams.  On the driver's floorboard, officers located one clear plastic bag containing two clear plastic bags. The first bag contained a white chunky substance which field tested positive for methamphetamine, cocaine and fentanyl and weighed approximately 1.80 grams. The second bag contained 13 individual baggies with a brown chunky substance which field tested positive for methamphetamine, cocaine, heroin, and fentanyl and weighed approximately 8.30 grams.  On the front passenger floorboard was a double wrapped clear plastic bag containing a white chunky substance which field tested positive for cocaine, fentanyl and methamphetamine and weighed approximately 3.52 grams. Officers also observed residual white powder throughout the front compartment of the vehicle, which was collected, and field tested positive for methamphetamine, cocaine and fentanyl and weighted collectively about 1.60 grams.

21.     Officers also located one bag of white powdery substance discarded in the rear backyard of 4871 North 36th Street, Milwaukee, Wisconsin, which was directly in the flight path

where OWENS and the other individual fled on foot. The white powdery substance field tested positive for fentanyl, cocaine and methamphetamine and weighed approximately 15.2 grams.

22.    Also, during the search of the vehicle, officers located nine cellphones. Case agents later obtained a federal search warrant for all the phones and identified one of the phones as OWENS's telephone, 414-885-9481.

23.    On January 11, 2024, OWENS was charged for this conduct in Milwaukee County Case 2024CF185.

24.    On January 13, 2024, OWENS's posted cash bail and was released from custody.

25.    On February 2, 2024, OWENS was charged by criminal complaint in the Eastern District of Wisconsin (EDWI) for violations of in relation to violation of Title 21, United States Code, Sections 841, 846 and 843(b), (24-M-303). An arrest warrant was issued for OWENS on February 2, 2024.

26.    On February 7, 2024, case agents executed a federal search warrant on OWENS's residence, XX50 South 60th Street, Apartment 2, Milwaukee, Wisconsin. Inside the residence, case agents located 432.2 grams of heroin; 165 grams of a unknown substance, suspected to be fentanyl (still waiting on DEA Crime lab results); 10.3 grams of crack cocaine; 21.2 grams of suspected cocaine (still waiting on DEA Crime lab results); and a black/blue Springfield XDM, .40 caliber, bearing serial number MG250495, loaded with 17 rounds of ammunition in the magazine and with one round in the chamber. OWENS was not present, but his roommate and co-conspirator, Kevin TENNER, was present. TENNER indicated to law enforcement that he did not know where OWENS was and TENNER last saw OWENS the evening before.

27.    On February 13, 2024, a grand jury in EDWI indicted OWENS for violations of Title 21, United States Code, Sections 841, 846 and 843(b) (24-cr-28).

Page 12

28.     On February 15, 2024, OWENS was scheduled to appear in state court for Milwaukee County case 2024CF185. OWENS failed to appear for court and a bench warrant was issued for his arrest.

29.     Case agents have monitored publicly available YouTube content of OWENS. Case agents observed posts of OWENS in several music videos and interviews following the attempt to arrest OWENS on February 7, 2024.

30.     Case agents specifically identified a YouTube channel labeled "Deadend Quan." Based on my knowledge of the case and individuals engaged OWENS's drug trafficking violations, I know this YouTube page features OWENS's rap videos, albums, and other music related material. Case agents have monitored this page and observed at least 9 music videos released since February 7, 2024, including one video labeled "U N—a's Though + Get Off Ig." The lyrics discuss "keeping" OWENS's name out "your mouth" and discuss reading things "in black and white," which case agents believe (based on the timing of the release in April 2024), is in reference to Criminal Complaint 24-M-303, which was widely distributed throughout social media.

31.     Case agents identified another YouTube channel labeled "Juice Talk TV". In February 2024, Juice Talk TV released a video, labeled "Deadend Quan addresses snitch allegations, says his name IS GOOD, on the Deadend block (THROWBACK)". During this video, OWENS was the subject of an interview where in the beginning of the interview OWENS stated, "I swear to god, I promise to god nigga I shot my first nigga where I shot my second nigga but the first nigga that told on me I shot right here." OWENS was being recorded walking in the middle of a residential street and pointing while making these comments. Case agents believe that based on the timing of the release and topic of discussion that OWENS was referencing his arrest in

Page 13

Milwaukee County in January, since case agents were aware that there was a significant amount of reaction on social media alleging that OWENS "snitched" to get released from custody.

32.     Case agents noted additional videos that had been released on Juice Talk TV where OWENS was interviewed, including a series of at least five videos over a two-month timespan beginning in July 2024.  One of the videos is labeled "Deadend Quan Talks paperwork, Being Most Wanted & Releasing music, "IM SOLID & ALWAYS WAS" pt1".  This video is an actual one-on-one interview with an individual case agents believe is the creator or individual running Juice Talk TV, Octavius SIMMONS, and was released on July 27, 2024.  Case agents reviewed law enforcement databases and determined Octavius SIMMONS is the registered agent of Juice Talk LLC.

33.     During the interview, OWENS discussed that "you shouldn't believe everything you see on the internet" and when asked what he specifically was talking about, OWENS responded "narc shit, talking police shit" which case agents believe is referring to the rumors of OWENS being a "snitch" or informant.   The interviewer, believed to be SIMMONS, then stated "you have been off the grid for a while and the music is still coming out."  OWENS responded, "for sure."  Later in the interview, SIMMONS asked OWENS about being featured in a Fox 6 News special, "Milwaukee's Most Wanted" which aired in April 2024.  OWENS stated "that he had not seen it" but later acknowledged that he "heard about it" then made a reference to him not being an informant since the fact he is a fugitive was highlighted.

34.     During the interview, OWENS was seated in front of a table and had two cellphones in front of him, which both appeared to be iPhones. Case agents eventually identified a possible telephone number for OWENS as 414-861-4774.

35.     On September 11, 2024, Honorable Judge Nancy Joseph authorized the electronic surveillance of OWENS's telephone number, 414-861-4774. Case agents reviewed call detail records for OWENS's telephone number 414-861-4774 and identified telephone number 414-861-3177 as one of his top callers.  Based on later review of record jail calls, case agents identified Makaylah BRACKINS as the user of telephone number 414-861-3177.  Case agents reviewed local police reports and determined that on July 2, 2023, BRACKINS had been operating a vehicle bearing the registration AJC-9755, listing to Phylicia Martin with an address of XX50 West Leon Terrace, Milwaukee, Wisconsin.  BRACKINS was subsequently stopped for a traffic violation and was issued a traffic citation by the Milwaukee County Sheriff's Office on July 2, 2023.

36.     Case agents learned that the court authorized electronic surveillance for OWENS's telephone number 414-861-4774 was consistently showing that the telephone was inside a radius that included XX50 West Leon Terrace, Milwaukee, Wisconsin.  Case agents then checked historical information and, while reviewing previous cellphone downloads obtained from OWENS's January 5, 2024 arrest, case agents observed that there calls and text messages from OWENS's previous number (414-885-9481) to telephone number 414-526-2204.  Case agents checked law enforcement databases and learned telephone number 414-526-2204 was registered to BRACKINS and had a registered address of XX50 West Leon Terrace, Milwaukee, Wisconsin, the account active through AT&T cellular service provider. Case agents reviewed call detail records for OWENS's telephone (414-861-4774) and observed that 414-526-2204 was one of the top callers.

37.     On the morning of September 26, 2024, case agents learned that the Milwaukee Police Department arrested OWENS on the evening of September 25, 2024. Milwaukee Police Officers attempted to traffic stop a Toyota Tundra, bearing Wisconsin license plate ATK-2330,

traveling southbound on I-794 at 8:22 pm. The license plate (ATK 2330) listed to a 2008 Buick Enclave, not the Toyota Tundra. This vehicle was later identified as a white 2008 Toyota Tundra, VIN 5TBRT54108S461313, bearing Wisconsin license plate ATK-2330.

38.     Upon Officers activating their emergency lights and siren in an attempt to conduct a traffic stop on the Tundra, the Tundra did not stop and began to accelerate at a high rate of speed. The Tundra began weaving in between other motorists, traveling eastbound on Layton Avenue in Milwaukee, Wisconsin. At that point, police initiated a pursuit, which ultimately lasted 10.26 miles. The Tundra reached an estimated speed of 111 MPH during the pursuit. Officers successfully deployed a tire deflation device, and the Tundra came to a stop after striking a pole in front of the address at 1612 North 26th Street, Milwaukee, Wisconsin. Once the Tundra came to a stop, officers observed the front driver side door and the front passenger door open. Officers observed two individuals exit the Tundra, with one individual exiting the front driver side door and the other individual exiting the front passenger door. OWENS was identified as the individual who exited the front driver side of the Tundra.

39.     After a short foot pursuit, OWENS was arrested. OWENS was in possession of $1,700.00. The front seat passenger, identified as Christopher Williams, was later taken into custody after a short foot pursuit. The rear seat occupant, identified as Frederick EVANS, did not flee from the Tundra and was cooperative upon initial contact with officers. EVANS was subsequently released from the scene. Both OWENS and Williams were transported to the Milwaukee to Police Department Central booking. Officers later learned that the Tundra had been reported stolen (Milwaukee Police Department case number C24–0916–0148).

40.     Officers searched the Tundra and located a clear plastic sandwich bag in the front passenger door, as well as a credit card and Wisconsin ID for Christopher Williams. Officers also

Page 16

located a silver and black digital scale in the front passenger side area. During the search officers located six cell phones (the "**Devices**") as following.

    **a.** a gray TLC flip phone track phone, unknown serial number, located on driver's side floorboard;

    **b.** a gray Vortex smartphone with a clear rubber case, unknown serial number, located on the ground outside the driver's door;

    **c.** a black Maxwest smartphone, unknown serial number, located in a tan bag in the rear passenger's seat;

    **d.** a gray Consumer Cellular smartphone, unknown serial number, located in a tan bag located on the rear passenger's seat;

    **e.** a white iPhone, unknown model or serial number, with a shattered back, in a black case, located on the front passenger's seat; and

    **f.** a white iPhone, unknown model or serial number, with a cracked front screen, inside of a black case, located on the front passenger's floorboard.

41.    Located outside the driver's side portion of the Tundra, officers located 11.1 grams of suspected THC; five yellow and orange pills, which later field tested positive for methamphetamine and fentanyl; and a sandwich bag which contained a purple powder like substance, which field tested positive for fentanyl. The total weight of the pills was 1.5 grams, and the total weight of the purple powder was .05 grams.

42.    Officers did note that prior to searching the Tundra, they observed the front passenger window to be cracked "a few inches" with a white and grey powder covering the side of the window and the rear passenger side window. Officers believe the substance was fentanyl due to the empty plastic bag, which was located in the rear passenger seat. Officers also noted the digital scale and cell phones were all covered in the same residue. Based on my training and experience, this information would be consistent with one of the Tundra's occupants discarding suspected controlled substances out of the window during the lengthy vehicle pursuit.

43.    Case agents did attempt to conduct a recorded interview with OWENS, but OWENS did not wish to speak with case agents at the time and no interview was completed.

44.     OWENS and Williams were referred to the Milwaukee County District Attorney's Office for charges related to the incident. OWENS was charged in Milwaukee County Case 2024CF4635 for Fleeing, First Degree Reckless Endangering Safety, Felony Bail Jumping, and Resisting and Obstructing an Officer.

45.     On the afternoon of September 27, 2024, case agents learned that OWENS had made a recorded jail call from the Milwaukee Police Department to an individual identified as Makaylah BRACKINS. The call was placed at 9:30 a.m. from OWENS to telephone number 414-861-3177. Case agents determined 414-861-3177 belonged to BRACKINS based on the content of the calls, specifically her spelling her name to OWENS. OWENS asked who she's with, and BRACKINS says "nobody." OWENS states, "I think what's his name set me up." BRACKINS then tells OWENS there is a video of "the police chasing" OWENS. When asked about the video, BRACKINS states, "Kiki said her and Cheese got into it" and at some point the video was referenced. OWENS says he released his property to her and that she has to come get it. OWENS then spells BRACKINS's first name (Makayla) and asks if he spelled it right. BRACKINS corrects him on the spelling (Makaylah) saying there is an H at the end. OWENS then confirms her birthday stating, "your birthday is Nov 17, 1998" and BRACKINS corrects him saying "Nov 18." Case agents confirmed that the spelling of BRACKINS name matched what case agents knew her name to be along with her date of birth. This leads case agents to believe that the person OWENS was in contact with is BRACKINS, using 414-861-3177.

46.     OWENS tells BRACKINS he that "really misses her" and asks, "did you see my cousin?" He states, "my cousin Fred" and BRACKINS says, "I don't know, was that who you was in the car with?" OWENS responds, "yeah, you know we on this phone." Case agents believe that OWENS is referencing the fact that the call was being recorded. BRACKINS then talks about

Page 18

the incident being on the news. OWENS says "Look, my drugs should be, you got to get, my uh cash app is on one of those phones bro, so you got to go get another phone or can you get into cash app." BRACKINS says she can get in there and OWENS replies, "get in there, there's 2 g's in there" and "come get this money it's like 1700 on my books." OWENS says, "get that cash app" and "put that money" and then he says, "remember them shoes, ain't anybody call you."

47.     OWENS then asks if someone called BRACKINS, but the name was inaudible. BRACKINS began to reply but OWENS cuts her off saying "she talk to who" and BRACKINS replies "your people?" OWENS states, "listen you know, remember I was telling you with them shoes we was waiting on before you got me, what's his name to put with it." BRACKINS replies "yeah." OWENS states, "that's why you got to go get that phone so I can give you." BRACKINS tries to talk but OWENS tells BRACKINS to "listen" and "get my other phone, the other one and get it on." OWENS appears to stutter and starts and stops before finally stating "so you can get what's his names number" and "Those shoes should be coming on Monday for sure and you know what I mean. You have to be, you know what I mean, on the G". Based on my training and experience, I know those engaged in drug trafficking will often use code words when discussing controlled substances, especially on recorded jail calls, in an attempt to evade law enforcement. I believe that before his arrest, OWENS had arranged a drug delivery ("shoes") that he had to pay for via his CashApp account and that he was instructing BRACKINS assist in completing the drug transaction.

48.     Case agents later learned that there was an additional jail call made from OWENS to BRACKINS at telephone number 414-861-3177. An officer with the City of Milwaukee Police Department reviewed the call and provided the information to case agents. Based on the conversation between OWENS and BRACKINS on telephone 414-861-3177, it is believed that

the "shoes" that are being discussed are being sent to an undisclosed location. The MPD Officer also indicated that in this additional call on BRACKINS telephone number 414-861-3177, OWENS is attempting to provide BRACKINS information for a "Spanish" guy, but OWENS refuses to say the name over the recorded jail call.

49.     According to the MPD Officer, OWENS tells BRACKINS that the number for this person, along with his name, is in OWENS's phone. Officers informed case agents that they believe OWENS is continuing to use coded information in an attempt to provide BRACKINS with the information over the jail call. It is believed OWENS and BRACKINS are using this coded information to prevent officers or case agents from learning of this information, consistent with OWENS and BRACKINS being engaged in criminal conduct. Based on the conversation summarized by Milwaukee Police Officers, case agents believe that OWENS is instructing BRACKINS to meet with this individual to pick up the "shoes" (suspected controlled substances) that are being shipped. Case agents further believed that based on the information from the recorded jail calls, OWENS is using an unknown delivery process to have illegal narcotics shipped.

50.     On September 28, 2024, Honorable Judge Stephen C. Dries authorized electronic surveillance for the number 414-861-3177. On September 29, 2024, Case agents obtained a GPS tracking warrant for a vehicle known and observed by case agents to be operated by BRACKINS. The vehicle was identified as 2011 White Subaru Outback SUV, bearing Wisconsin license plate AWD-3489, with a VIN of 4S4BRCKC6B3368655. Case agents installed the GPS on the morning of September 30, 2024, at BRACKINS's residence located at 5350 West Leon Terrace, Milwaukee, Wisconsin.

51.     Case agents learned that on September 29, 2024, OWENS made a jail call to 414-861-3177 (BRACKINS). During the conversation, OWENS told BRACKINS that he needs her

Page 20

to come "down here to release the money" and asks her "Did you get the cash" and asks, "how much 2 G's on there," which case agents believe is referencing two thousand dollars. OWENS then stated, "what did bro say, bro say he is going to send it next week though" and BRACKINS confirms that. OWENS then states, "I want you come up here and try to get that money, and I want you to with cuz" and OWENS makes reference to a jail video call before the call is terminated.

52.     Case agents learned that on September 30, 2024, OWENS made a jail call to 414-861-3177 (BRACKINS). BRACKINS tells OWENS that she is packing because her lease "is up" and she is moving in with her "mama." BRACKINS tells OWENS that "his stuff" is going to be put in the storage unit. OWENS then asked her if someone did something, but it was largely inaudible due to background noise. BRACKINS then responds, "yeah we was here this morning and got" but the rest of the statement was inaudible. OWENS asked if it worked and BRACKINS responded, "he didn't do it here he had left." BRACKINS then asked, "what do you want me to do about your shoes?" OWENS responds, "shoes" and BRACKINS responds, "You want me to" and the rest is inaudible. OWENS then responds, "what did you say" and BRACKINS replies "You want me to leave it alone or what." OWENS states, "I thought ummmm" and BRACKINS then tells OWENS "the other dude said he was going to help but the other dude said he wanted to do it." OWENS then says, "It was up to you." BRACKINS then states, "he said he didn't know where dude got that stuff from." OWENS made a comment, "hell no, I don't want, no, hell no, I thinking he thought he want the shoes, he want the shoes though." OWEN then says, "Tell folks to you need to save that money." BRACKINS replied, "he was going to send it to me" and OWENS states "I wanted you to but I didn't want to put that much pressure on you."

53.     Later in the call, BRACKINS says, "your cousin tried to get me to call him today" and something to the effect of, "I wanted to wait til you told me what to do." OWENS replies

Page 21

"that's 100." OWENS says he is going to call "Cuz" on a video call and BRACKINS says he got a new number but is getting text from a "text free app." BRACKINS says he came over "this morning." There is nothing further in the call that is of evidentiary value.

54. Case agents learned that on September 30, 2024, OWENS made an additional jail call to 414-861-3177 (BRACKINS) and during that call BRACKINS provided a number for OWENS's "cuz" as described in an earlier call. The phone number was identified as 414-307-0521 and the call was terminated shortly after that.

55. Case agents learned that OWENS then called 414-307-0521 on September 30, 2024. During that call with a male believed to be Frederick EVANS, OWENS talks about that he believes he was set up the night he was arrested. OWENS then tells the individual on the phone something referencing "her", but the statement is inaudible. OWENS tells the male, that "she" is about to move and the male replies "she told me today when I went over there." OWENS tells the male, "You need to figure it out for me." The caller states "I can't believe Chris feels that way." Case agents believe this in reference to the front seat passenger who was arrested with OWENS, Christopher WILLIAMS. The caller then denies being the one who may have set OWENS up.

56. Case agents learned of a call OWENS made from the Milwaukee County Jail on September 30, 2024, to the number 414-793-0708. Case agents checked law enforcement databases and open-source records and learned that the number is registered to Raven S. LAMBERT. The call lasted 8 minutes and 25 seconds. During the call, which case agents believe to be with LAMBERT, LAMBERT told OWENS that she was at work and needed to sell one more car. OWENS made the comment that if he gets "out on the bracelet" (which case agents believe is a reference to being released on electronic monitoring) that she needs to "hook me up with a

truck." This leads case agents to believe that LAMBERT is possibly working at a vehicle dealership or rental agency.

57.     Later in the call, OWENS tells LAMBERT, "I'm have that cat switch that shit to your bank account bro, cause I know you aint going to touch shit and all that." LAMBERT then asks OWENS about his recent court appearance. Later in the call, OWENS is making a comment referencing what he should have done, and LAMBERT responds, "let's not talk about what you shouldn't have did and should've did." OWENS responds, "I need you to do right, I need you to put that shit in your account and be my businesswoman for real, I need you to handle business, cause that will be our little project."

58.     Near the end of the call, LAMBERT says "you couldn't get it til tomorrow." OWENS responds "No, it comes thru tomorrow I'm glad you did that too baby I appreciate it" and "You came thru when I needed, I'm glad you did what I told you." LAMBERT responds, but it is difficult to hear since OWENS is attempting to talk over her, but case agents heard "I would do that in your situation." OWENS responds, "I love you for that" and "you think you are ready to be my businesswoman like you go" and LAMBERT responds "Yes, I can, I know how to do shit like that, I said something about that before a long long time ago but you, you know." At that point OWENS cuts LAMBERT off and tells her he is going to call her back and the call is terminated.

59.     Case agents then reviewed the jail calls made by Christopher WILLIAMS. On September 28, 2024, WILLIAMS made a jail call to the number 262-221-7899. During the call, which is to an unidentified female, WILLIAMS and the female are arguing, and the female tells WILLIAMS that Dominique wants her (the caller) to call him on three-way when WILLIAMS calls. WILLIAMS replies "who" and the female replies "Gucci." The female then makes a

Page 23

comment about the back door. The female then states, "you should not have (inaudible) with Gucci" and then states, "whatever the fuck you all threw out, he went back with another nigga to go get that shit and when Dominique went back everything was gone already." The female continued, "I told him that what he did already cause when I met him to get that other black stuff he said you owed him some money." The female then asks WILLIAMS if he wants her to call him and the female connects another unknown male in the call. I believe this call refers to WILLIAMS and the other occupants of the fleeing car discarding drugs out of the window during the pursuit ("whatever the fuck you all threw out…") and that different individuals returned to the location where the drugs were discarded after WILLIAMS's arrest.

60.     During the call, WILLIAMS is talking to the male about his charges. The female then asks, "Did Gucci tell you an unmarked car was watching you?" The female then asks WILLIAMS why "Gucci has your phone?" Later in the call, WILLIAMS denies knowing OWENS and the unknown male on the calls states, "That nigga had took us to the junkyard to look for those parts, he had already went to the junkyard the same day with some other niggas and shit and got that got that shit." WILLIAMS replies, "You talking about the whatcha you call it," and WILLIAMS replies, "Yup, he was telling us someone else went there before him and probably picked that shit up, and it was him the whole time."

61.     Later in the call, the parties are talking about the pursuit with OWENS, EVANS, and WILLIAMS. The unknown male makes a comment about "Gucci" being asleep in the back seat and WILLIAMS says he was not asleep. Then the female reads part of a media description of the pursuit, and they are discussing how law enforcement knew someone in the car was wanted by the US Marshals, which is consistent with the active warrants for OWENS. Further into the call, when discussing how and if they were set up, WILLIAMS states "Gucci was trying to get that

Page 24

money from Quan." Case agents believe this is in reference to OWENS ("Quan" is believed to be a nickname for Marquan OWENS).

62.     Later in the morning of September 30, 2024, case agents were conducting surveillance when they observed a U-Haul pull up to BRACKINS's residence. An unidentified male exited the U-Haul and appeared to introduce himself to BRACKINS who was observed outside of the residence at 5350 West Leon Terrace, leading case agents to believe that BRACKINS and the unidentified male had not met before. The unidentified male then began moving items from the residence to the inside of the U-Haul. Case later confirmed in a jail recorded call that BRACKINS was moving due to her "lease being up."

63.     Case agents continued to monitor BRACKINS's residence until the unidentified male got into the driver's seat of the U-Haul and BRACKINS got into the driver's seat of the Subaru. Case agents then followed the Subaru and U-Haul to the Menards Self-Storage located at 8120 West Brown Deer Road, Milwaukee, Wisconsin. Case agents observe the U-Haul, and the Subaru, enter the secured lot and at that point case agents were unable to maintain surveillance.

64.     Approximately one hour later, the Subaru was observed exiting the lot along with the U-Haul and each vehicle then went in opposite directions. Case agents continued to monitor the Subaru. The Subaru then returned to the 5350 West Leon Terrace residence for a short time where BRACKINS was observed loading bags into the Subaru before departing and traveling to a residence located at 1540 North Jefferson Street, Milwaukee, Wisconsin.

65.     Upon arriving at the 1540 North Jefferson location, case agents observed a black female exit the residence with what appeared to be a suitcase similar to a carry-on suitcase and place it in the trunk of the Subaru. Case agents have preliminarily identified this female as Raven LAMBERT, a known girlfriend of OWENS, based on law enforcement databases and social

Page 25

media. The Subaru then traveled directly back to the 5350 West Leon Terrace residence and upon arrival case agents observed a black male standing outside of the residence. Case agents were able to identify this male as Frederick C. EVANS based on law enforcement databases.

66.     Upon meeting with EVANS, the female believed to be LAMBERT remained in the vehicle, while BRACKINS exited the vehicle and met with EVANS. BRACKINS and EVANS appeared to be engaged in an animated discussion with both appearing to yell at each other. At one point, BRACKINS handed EVANS an unidentified item before the parties separated. EVANS got into an unidentified black SUV and departed the area. BRACKINS entered the Subaru and was followed to the Servite apartment complex on North Servite Drive, Milwaukee, Wisconsin. The female believed to be LAMBERT exited the Subaru and entered the apartment complex. Case agents were unable to see her exact location and were unable to observe if LAMBERT retrieved the carry-on suitcase prior to entering the apartment complex. Afterwards, BRACKINS drove to a separate portion of the apartment complex and proceeded to park in an underground parking structure. Case agents terminated surveillance a short time later. Case agents reviewed the GPS data and learned that later that evening, BRACKINS's vehicle responded back to the residence located at 5350 West Leon Terrace. and eventually returned to the Servite Apartments located at 8433 North Servite Drive.

67.     Based on my training and experience, I know that "shoes" is a slang term used by drug traffickers for large quantities of illegal narcotics, and commonly is used to reference heroin/fentanyl. Case agents are also aware that OWENS was arrested with $1,700.00 in US Currency on September 25, 2024, which is consistent with him telling BRACKINS to retrieve the currency from his property. Case agents know that individuals will use coded messages and talk when trying to evade recordings, like calls commonly made in corrections settings. Case agents

Page 26

believe based on the jail calls, surveillance, and their training and experience that: prior to his arrest, OWENS arranged to acquire a delivery of controlled substances ("shoes") and directed BRACKINS to retrieve this package. Case agents believe that BRACKINS was aware of the package contents and appears to be a willing participant in assisting OWENS.

68. On October 7, 2024, case agents retrieved the **Devices** that had been seized as evidence by the Milwaukee Police Department on September 25, 2024, from the Property Control Division of the Milwaukee Police Department and immediately transported them to the WCDTFO where they were placed into WCDTFO Property Inventory.

69. Based on my training and experience and work with fellow law enforcement, I know that these **Devices** have been stored in a way its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of Milwaukee Police Department and then case agents.

70. Case agents believe that the **Devices** will contain evidence of narcotic trafficking and may have information related to the shipment that OWENS was supposed to retrieve prior to being taken into custody. This includes OWENS's CashApp information, communications with his source of supply, communications with the third party referenced in the jail calls, photographs, videos, and application data of OWENS in possession of drugs or currency, etc., as well as evidence documenting which phones were used by which occupant of the fleeing vehicle. I also believe that evidence on the **Devices** will also help confirm what, if any, narcotics or other contraband were present in the fleeing vehicle and later discarded during the pursuit.

## IV. TECHNICAL TERMS

71. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence

Page 28

of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

72. Based on my training, experience, and research, I know that the Devices have capabilities that allow it to serve as a wireless telephone, digital camera and video recorder, portable media player, internet web browser, and GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## A. ELECTRONIC STORAGE AND FORENSIC ANALYSIS

73. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

74. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.

Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

75. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

76. *Manner of execution.* Because this warrant seeks only permission to examine the Devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## V. CONCLUSION

77. Based on the above information provided in this affidavit, I believe there is probable cause that the Devices contains evidence of distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances, and use of a communication device in furtherance of drug trafficking, violations of Title 21, United States Code, Sections 841, 843 and 846, have been committed by Marquan OWENS, and other identified and unidentified subjects.

Page 31

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

The property to be searched are the six cellular phones recovered from inside and immediately outside a White 2008 Toyota Tundra, VIN 5TBRT54108S461313, bearing Wisconsin license plate ATK-2330, located near 1612 North 26th Street, Milwaukee, Wisconsin, on September 25, 2024, more fully described as the following, hereinafter referred as the "Devices":

**a.** a gray TLC flip phone track phone, unknown serial number, located on driver's side floorboard;
**b.** a gray Vortex smartphone with a clear rubber case, unknown serial number, located on the ground outside the driver's door;
**c.** a black Maxwest smartphone, unknown serial number, located in a tan bag in the rear passenger's seat;
**d.** a gray Consumer Cellular smartphone, unknown serial number, located in a tan bag located on the rear passenger's seat;
**e.** a white iPhone, unknown model or serial number, with a shattered back, in a black case, located on the front passenger's seat; and
**f.** a white iPhone, unknown model or serial number, with a cracked front screen, inside of a black case, located on the front passenger's floorboard.

The Devices are currently stored at the Waukesha County Drug Task Force Offices (WCDTFO), located in Waukesha, Wisconsin.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

Page 32

# ATTACHMENT B

## Particular Things to be Seized

All records and information on the Devices described in Attachment A that relate to violations of illegal possession with intent to deliver controlled substances, and conspiracy to do the same, in violation of Title 21, United States Code, Sections 841 and 846; and use of a communication device in furtherance of drug trafficking, in violation of Title 21, United States Code, Section 843 including:

a. Preparatory steps taken in furtherance of this crime;

b. Any audio, video, and/or photograph(s) files on the phone of criminal activity or of evidentiary value;

c. All voicemail and call records;

d. All text messages and call history;

e. Contact list, to include names, addresses, phone numbers, and/or email addresses;

f. All social media sites used and applications for social media sites;

g. Lists of customers and related identifying information;

h. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

i. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information); and,

j. All bank records, checks, credit card bills, account information, and other financial records.

k. All internet activity;

l. All location data including from the phone and/or from any downloaded applications;

Page 33

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

   a.   records of Internet Protocol addresses used;

   b.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the case agents may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.